Steve H. Patience, SBN 009537
Skousen, Gulbrandsen & Patience, PLC
414 East Southern Avenue
Mesa, AZ 85204-4922
Telephone: 480-833-8800
shp@sgplaw.com

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**
**PHOENIX DIVISION**

| | |
|---|---|
| Lawrence E. Meyers and<br>Dawn Burstyn-Meyers,<br>    Plaintiffs,<br><br>v.<br><br>Wright Medical Technology, Inc.,<br>a Delaware corporation;<br><br>    Defendant. | No.<br><br>**COMPLAINT & DEMAND**<br>**FOR JURY TRIAL** |

Plaintiffs, LAWRENCE E. MEYERS and DAWN BURSTYN-MEYERS, by and through their undersigned attorneys, hereby file this Complaint and Jury Demand against Defendant WRIGHT MEDICAL TECHNOLOGY, INC., (often referred to herein as "Defendant" or "'Wright Medical"), and allege the following in support thereof:

## PARTIES

1.    At all relevant times, Plaintiff Lawrence E. Meyers was and is a resident and citizen of the State of Arizona, currently residing in Maricopa County, Arizona.

2.     At all relevant times, Plaintiff Dawn Burstyn-Meyers was and is the wife of Plaintiff Lawrence E. Meyers and was and is a resident and citizen of the State of Arizona, currently residing in Maricopa County, Arizona.

3.     Defendant Wright Medical Technology, Inc., is a Delaware corporation with its principal place of business at 1023 Cherry Road, Memphis, Tennessee 38117, and as such is a citizen of both the State of Tennessee and the State of Delaware.

4.     Defendant Wright Medical Technology, Inc., is registered to do business in the State of Arizona, and at all times relevant hereto did business in the State of Arizona.

5.     Defendant Wright Medical Technology, Inc., at times relevant hereto, was engaged in the business of designing, manufacturing, distributing, selling, marketing and/or introducing into interstate commerce, either directly or indirectly through third-parties or related entities, various prosthetic orthopedic products, including the Wright Medical hip products that are in issue in this civil action.

6.     Defendant caused an event to occur in the State of Arizona out of which Plaintiff's claims arise, and at all relevant times conducted regular and sustained business in the State of Arizona.

## JURISDICTION and VENUE

7.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) as the parties are citizens of different States and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

8.     Defendant is subject to the Court's personal jurisdiction because Defendant has sufficient minimum contacts with Arizona such that the exercise of jurisdiction over Defendant will not offend traditional notions of fair play and substantial justice.

9.     Defendant is a corporation, and thus is deemed to reside in any judicial district in which it is subject to the jurisdiction of this Court.  28 U.S.C. §1391(c).

10.    Defendant did business in Maricopa County, Arizona, arranged for the delivery of the medical devices that are the subject of this civil action in Maricopa County,

Arizona, the surgeries performed upon Plaintiff that are relevant and material to this civil action took place in Maricopa County, Arizona, the surgeries that are relevant and material to this civil action took place in Maricopa County, Arizona, and the sale to Plaintiff of the Wright Medical devices that are the subject of this civil action took place in Maricopa County, Arizona.

11.     As Defendant is subject to personal jurisdiction in Arizona, Plaintiffs reside in the State of Arizona, within the jurisdictional boundaries of this United States District Court, and a substantial part of the events giving rise to this claim occurred in Maricopa County,   State of Arizona, venue is proper in this District pursuant to 28 U.S.C. § 1391(a)(1).

## **Wright Medical Technology, Inc.**

12.     At all times relevant hereto, Wright Medical Technology, Inc. was involved in the design, manufacture, labeling, marketing, distribution, and sale of prosthetic hip devices throughout the United States, and in Arizona, including the Conserve® Femoral Head, the Dynasty® Hip System shell or "cup" with a metal cobalt-chromium alloy liner, the titanium Profemur® Modular Neck, and the Profemur® Plasma Z Stem.

13.     Wright Medical Technology, Inc. designed the Conserve® Femoral Head, a cobalt-chrome alloy device intended to replace a natural bone femoral head.

14.     Wright Medical Technology, Inc. designed the Dynasty® Acetabular System, a cobalt-chrome cup intended to be used with a polyethylene liner or metal liner [cobalt chrome or "CoCr"].

15.     In the metal-on-metal configuration of the Conserve®–Dynasty® devices the metal femoral head is in direct contact with a metal lined acetabular cup.

16.     Wright Medical Technology, Inc. designed the titanium Profemur® Modular Neck.

17.     Wright Medical Technology, Inc. designed the Profemur® Plasma Z Stem®.

18.     The use of a Profemur stem and modular neck is known as the Profemur® Hip System.

3

19.    The use of a Conserve® femoral head, a Dynasty® acetabular system, and a Profemur® stem-modular neck shall hereinafter be referred to as the Conserve®–Dynasty®–Profemur® Hip System.

20.    Plaintiff alleges that Wright Medical Technology, Inc. did not properly test these devices for safety, efficacy, and durability.

21.    Plaintiff alleges that Wright Medical had not applied for or received clearance from the United States Food and Drug Administration [FDA] to market and distribute its Profemur Plasma Z Stems for use with its titanium Profemur Modular Necks.

22.    Plaintiff alleges that Wright Medical had not informed Dr. Firestone, or any other surgeon, that it had not received FDA clearance for its Profemur Plasma Z Stems to be used with its titanium Profemur Modular Necks.

23.    Plaintiff alleges that Wright Medical had not informed Dr. Firestone, or any other surgeon, that using its Profemur Plasma Z Stems with its titanium Profemur Modular Necks was an "off label" use of those devices.

24.    When Wright Medical did apply for FDA cleance to use its Profemur Plasma Z Stems with its titanium Profemur Modular Necks, that application was not approved.

25.    To this day the use of Profemur Plasma Z Stems with titanium Profemur Modular Necks, is not an FDA cleared use of those devices.

26.    On September 9, 2020, all Profemur titanium Profemur Modular Necks were the subject of an FDA Class 2 Device Recall.

27.    Plaintiff further alleges Defendant marketed, promoted, and encouraged orthopedic surgeons in the U.S. to use the Conserve®–Dynasty®–Profemur® Hip System without properly screening, selecting, or training the surgeons on how to properly implant the hip system.

28.    Plaintiff alleges that prior to Plaintiff Lawrence E. Meyers' hip replacement surgeries, Defendant knew or should have known that the Conserve®–Dynasty®–Profemur® Hip System was failing and causing serious post-implant complications for many patients.

4

29.     Those complications arising out of the implantation of the Conserve®– Dynasty®–Profemur® Hip System, which Defendant knew or should have known about, include but are not limited to: bone cysts; pseudo-tumors; metallosis and osteolysis; high levels of metal ions, such as chromium and cobalt, in the bloodstream; detachment, disconnection, and/or loosening of the acetabular cup; loosening of the femoral component; corrosion at the modular junctions, fracture of the modular necks, and other complications requiring revision surgery.

30.     Plaintiff alleges Defendant concealed the true risks of the Conserve®– Dynasty®–Profemur® Hip System and instead continued to market, defend, and promote the Conserve®–Dynasty®–Profemur® Hip System.

## FACTS

### Plaintiff Lawrence E. Meyers' Implant Surgeries.

31.     Prior to implantation, Plaintiff Lawrence E. Meyers received representations from his implanting orthopedic surgeon with respect to the devices at issue in this litigation. Specifically, Lawrence E. Meyers was advised by Theodore P. Firestone, M.D., orthopedic surgeon, that the devices at issue were (1) appropriate for him; (2) would permit him to return to an active lifestyle; and (3) would likely last approximately 20 to 25 years following implantation, if not longer.

32.     Upon information and belief, the representations received by Plaintiff Lawrence E. Meyers from Dr. Firestone, as described in the above paragraph, were based on representations that Dr. Firestone received from Defendant, as discussed in detail throughout this Complaint.

33.     Upon information and belief, the representations received by Dr. Firestone from Wright Medical included that the Profemur® devices were legally marketed for use in the United States.

34.     Upon information and belief, the representations received by Dr. Firestone from Wright Medical included that the Profemur® devices had been used in Europe since the year 1985 and had never experienced a clinical failure by fracture of the modular neck.

35.     Upon information and belief, the representations received by Dr. Firestone from Wright Medical included that the Wright Medical devices could be expected to last at least 20 years with need for revision due to issues with the devices themselves wearing out.

36.     Plaintiff Lawrence E. Meyers relied on the representations he received from Dr. Firestone, and discussed in detail herein, in proceeding with implantation of the devices at issue.

37.     Upon information and belief, Dr. Firestone relied on Wright Medical's representations discussed herein, including that the devices at issue would permit a patient to return to an active lifestyle, in deciding to implant Plaintiff Lawrence E. Meyers with the devices at issue.

38.     On December 17, 2007, Plaintiff Lawrence E. Meyers underwent a total hip arthroplasty (THA) on his left side, performed at Scottsdale Healthcare Shea, Scottsdale, Arizona, by orthopedic surgeon, Theodore P. Firestone, M.D.

39.     Wright Medical Devices implanted at the December 17, 2007, left THA surgery included:

> Profemur Plasma Z Stem
> Size 6
>
> Profemur Ti Modular Neck
> Ref: PHA0-1222;
> Short A/R VAR/VAL
>
> Conserve CoCr Femoral Head
> Ref: 38AM4400
> 44mm OD; medium neck
>
> Dynasty Shell
> 58 mm OD
>
> Dynasty CoCr Liner

40.     On March 13, 2008, Plaintiff Lawrence E. Meyers underwent a total hip arthroplasty (THA) on his right side, performed at Scottsdale Healthcare Shea, Scottsdale, Arizona, by orthopedic surgeon, Theodore P. Firestone, M.D.

41.     Wright Medical Devices implanted at the March 13, 2008, right THA surgery included:

Profemur Plasma Z Stem
Size 5

Profemur Ti Modular Neck
Ref: PHA0-1222;
Lot: 498730
Short A/R VAR/VAL

Conserve CoCr Femoral Head
Ref: 38AM4400
Lot: 471657
44mm OD; medium neck

Dynasty Shell
58 mm OD

Dynasty CoCr Liner

42.     At the time of these hip implant surgeries Wright Medical had not applied for or received clearance from the United States Food and Drug Administration [FDA] to market and distribute its Profemur Plasma Z Stems for use with its titanium Profemur Modular Necks.

43.     At the time of these hip implant surgeries Wright Medical had not informed Dr. Firestone, or any other surgeon, that it had not received FDA clearance for its Profemur Plasma Z Stems to be used with its titanium Profemur Modular Necks.

44.     At the time of these hip implant surgeries Wright Medical had not informed Dr. Firestone, or any other surgeon, that using its Profemur Plasma Z Stems with its titanium Profemur Modular Necks was an "off label" use of those devices.

7

45.     The September 9, 2020, FDA Class 2 Device Recall of the titanium Profemur Modular Necks came years too late to benefit Plaintiff.

46.     Years after being implanted with the Conserve®–Dynasty®–Profemur® Hip System, Plaintiff Lawrence E. Meyers started to experience pain in or around his right hip joint, along with cobalt and chromium levels that were increasing over the past few years.

47.     With continuing and increasing pain in his right hip, and elevated serum cobalt/chromium levels reported on July 22, 2019, as well as based on his surgeon's experience with many prior patients who suffered similar symptoms with similar devices, and symptom relief after revision of the bearing surface to a dual mobility device, it was recommended by Dr. Firestone that Plaintiff have a revision of the bearing surface of his right hip.

48.     On November 13, 2019, a right hip revision procedure was performed at HonorHealth Scottsdale Thompson Peak Medical Center, 7400 East Thompson Peak Parkway, Scottsdale, Arizona 85255, by orthopedic surgeon Theodore P. Firestone, M.D.

49.     In the November 13, 2019, right hip revision procedure Plaintiff Lawrence E. Meyers' right hip was revised, resulting in removal and replacement of the previously implanted Conserve®–Dynasty®–Profemur® Hip System metal-on-metal bearing surface with a Biomet Dual Mobility Active Articulation Hip System, and a MicroPort Alumina Matric Composite Delta Option Head, and a Delta Option Neck Sleeve.

50.     The operative note from the November 13, 2019, revision procedure references a finding of stained synovium and significant corrosion on the modular neck.

51.     The extracted modular neck shows significant corrosion on both the proximal and distal trunnions of that device.

52.     Due to concerns with a history of the Wright Medical titanium Profemur Modular Necks corroding, and fracturing, the intra-operative medical decision was also made by Dr, Firestone to remove and replace the titanium Profemur Modular Neck of that hip with a new, not yet corroding, titanium modular neck.

53.     As a direct and proximate result of the failure of the Conserve®–Dynasty®–Profemur® Hip System designed, manufactured, and sold by Defendant, Plaintiff Lawrence E. Meyers has sustained injuries and damages including, but not limited to, the following:

      a.  undergoing revision surgery to remove and replace the defective hip devices;

      b.  adverse symptoms associated with elevated metal ion levels, including metallosis and the loss of tissue and cartilage in his right hip joint;

      c.  past and future pain, suffering and anguish, in both mind and body;

      d.  permanent diminishment of his ability to participate and enjoy the affairs of life;

      e.  medical bills and treatment associated with the replacement procedure, therapy, recovery from the same and reasonably probable to be incurred in the future;

      f.  loss of enjoyment of life;

      g.  disfigurement; and,

      h.  Permanent physical impairment, disability past and future.

54.     Having a similar hip construct in his left hip, Plaintiff Lawrence E. Meyers is at a significant risk of the need in the future for a revision of his left hip.

55.     Having the now recalled titanium Profemur Modular Necks mated with Wright Medical Profemur Plasma Z stems implanted in both his right hip and his left hip, Plaintiff Lawrence E. Meyers is at a significant risk of having each of those modular necks corrode and fracture in the future and needing emergency revision surgery to remove and replace the entire hip head-neck-stem assembly in each of those hips.

**The Wright Medical Metal-on-Metal Conserve®–Dynasty®–Profemur® Hip System**

56.     The Wright Medical Conserve® Femoral Head is compatible for use with an acetabular cup component called the Wright Medical Dynasty® cup with a metal liner,

which is what was utilized in Plaintiff Lawrence E. Meyers' bilateral 2007 and 2008 hip surgeries.

57.     The Wright Medical Conserve® Femoral Head and the Wright Medical Dynasty® cup with a metal liner, were cleared to the market under a process by the Food and Drug Administration (hereinafter referred to as the "FDA") governed by Section 510(k) of the Food, Drug and Cosmetic Act.

58.     The Wright Medical Conserve®–Dynasty®–Profemur® Hip System cup with a metal [CoCr] liner is known as a "metal-on-metal" bearing surface hip joint, where both the Conserve® femoral head and the Dynasty® cup with a metal liner are made of a cobalt-chrome alloy, and the femoral head and the metal liner are in contact, or "articulate" with each other.

59.     Prior to, on, and after December 2007, Defendant knew that the Conserve® Hip metal-on-metal bearing surface had a propensity to excessively wear at the metal-on-metal bearing surface and shed metal ions and/or metal debris from the articulating surfaces.

60.     Prior to, on, and after December 2007, Defendant knew that the excessive wear of the Conserve®–Dynasty® metal-on-metal bearing surface caused some patients to develop adverse reactions to high levels of metal debris generated by normal use of the metal-on-metal Conserve®–Dynasty® Hip System.

61.     Prior to, on, and after December 2007, Defendant knew that the metal-on-metal Conserve®–Dynasty® Hip System was defective and harmful to consumers and that these components had an unacceptable failure and complication rate.

62.     Prior to, on, and after December 2007, Defendant marketed their metal-on-metal Conserve®–Dynasty® Hip System with claims that it was superior to other hip devices, both its own and other manufacturers, in that it would not wear or shed metal ions or metal debris at the rate of other hip devices, and that it would last longer than other hip devices then on the market.

63.     Prior to, on, and after December 2007, Defendant withheld from consumers and surgeons, including Plaintiff's implanting surgeon, the truth it knew, which is that its metal-on-metal Conserve®–Dynasty® Hip System was not superior to other hip devices then on the market, both its own and other manufacturers, and would shed metal debris at an increased rate compared to other hip devices and would likely need to be revised earlier than other non-metal-on-metal devices then on the market.

64.     At the time of Wright Medical's design, manufacture, marketing, distribution, and sale of the metal-on-metal Conserve®–Dynasty® Hip System, feasible, alternative safer designs were known and available to Wright Medical including, but not limited to, designs that utilized non-metal-on-metal articulating surfaces such as polyethylene on metal, or ceramic on ceramic articulating surfaces, which are less likely to result in the emission of harmful metal debris, metal ions, and adverse symptomology related to the same.

65.     Had Defendant Wright Medical properly and adequately tested the metal-on-metal Conserve®–Dynasty® Hip System, they would have discovered that the metal-on-metal Conserve®–Dynasty® Hip System would emit substantial metal debris and harmful metal ions and was certain to fail in numbers and rates significantly higher than expected and at rates higher than other available feasible, alternative hip devices.

**Wright Medical Titanium Profemur® Modular Necks**

66.     In approximately the year 1985 a European manufacturer of artificial hip devices, known as Cremascoli Ortho Group ("Cremascoli"), developed the first prototype of what became known as the titanium Profemur® Modular Necks.

67.     The first prototype of what became known as the titanium Profemur® Modular Necks was patented with the European Patent Office by Cremascoli in 1986.

68.     What became known as the titanium Profemur® Modular Necks were first distributed in Europe by Cremascoli in 1986.

69.     The name PROFEMUR® was originated by Cremascoli as a brand name for certain models or designs of its artificial hip devices.

11

70.     Cremascoli Profemur® prosthetic hip devices are the subject of medical literature published in 1996.  [See: The Modular Prosthesis for Hip Revision Surgery: Experience with the Profemur Stem: Masse, Scagnelli, Trossarello, Buratti, Randelli, Basso, Dei Poli, Giaretta, Leonardi, Massetti, Pugliese: Italian Journal of Orthopaedics and Traumatology-Suppl. 1, Vol XXII. - Fasc. 2- GIUGNO 1996.]

71.     The above referenced 1996 medical literature is cited by Wright Medical in various Wright Medical Profemur® Technical Monographs that it created and distributed. [e.g., PROFEMUR™ TOTAL HIP SYSTEM, PERFORMANCE CHARACTERISTICS OF THE PROFEMUR™ TOTAL HIP SYSTEM, © 2002 Wright Medical Technology, Inc., MH688-102; and PROFEMUR® R Revision Hip System, TECHNICAL MONOGRAPH, © 2010 Wright Medical Technology, MH688-102, Rev. 6.10, among others.]

72.     By the end of the year 1998, the Cremascoli modular neck product line had been expanded to include "versions" of modular necks that did not exist in 1986.

73.     Based on publicly available patent documents of Cremascoli, it appears that there was a change in some aspects of the design of the titanium Profemur® modular necks before these products were first distributed in the United States.  [Hereinafter at times referred to as a "re- design".]

74.     In 1999 a "re-design" of the Profemur modular necks, the design, geometry, and weight of the modular necks, compared to the necks that Cremascoli had manufactured beginning in 1985, and which Cremascoli had continued to manufacture and distribute until that design change.  In December 1999, Wright Medical Group, Inc., the parent corporation of Wright Medical Technology, Inc., purchased Cremascoli Ortho, acquiring Cremascoli's Profemur® artificial hip product line, related documents, and manufacturing facilities in Toulon France.

75.     Upon information and belief, before the acquisition of Cremascoli by Wright Medical, a re-design of the Profemur® Modular Necks at the mid-body of the neck increased the range of motion of the hip joint in an assembled artificial hip when used with

compatible femoral heads and acetabular components.  [Hereinafter these re-designed Profemur® Modular Necks at times are referred to as the "PHA0" modular necks.]

76.    "Version" is the term Wright Medical used for the different lengths and angles of its Profemur® Modular Necks, identified by unique catalog numbers.  For example, the Wright Medical Profemur® titanium varus/valgus 8° long neck, catalog # PHA0-1254, was one "version" of a Wright Medical Profemur® Modular Neck.

77.    After the acquisition of Cremascoli, Wright Medical expanded the Profemur® product line to include additional designs and "versions" of Profemur® Modular Necks that did not exist prior to its acquisition of Cremascoli.

78.    Sometime after the acquisition of Cremascoli, Wright Medical began to refer to some of its products as the "Profemur® Total Hip System."

79.    Before Wright Medical made its first 510(k) application for a hip device that was called a "Profemur", the word or brand name "Profemur" was being used for the modular neck devices that were originally designed by Cremascoli in 1985 and were being sold in Europe.

80.    On September 26, 2000, Wright Medical Technology, Inc., notified the United States Food and Drug Administration [FDA] of its intent to market what it called the "PRO- FEMUR R Revision Hip System" by way of what is known as an Abbreviated 510(k) Premarket Notification.  [See: FDA 510(k) K003016.]

81.    Wright Medical's Abbreviated 510(k) Premarket Notification for the PRO-FEMUR R Revision Hip System Device Description included, "twelve modular necks which are available in six versions and two lengths: Neutral, anteversion/retroversion 8° or 15°, varus/valgus 8°, or combination of anteverted/retroverted – varus/valgus (in both short and long lengths)."

82.    In the 510(k) process the FDA reviewed the submission and representations of Wright Medical about the product and concluded that these Profemur devices were substantially equivalent to other already legally marketed devices.

83.     In the Wright Medical 510(k) application for the Profemur R Revision Hip System, none of the other products that Wright Medical represented to be the substantial equivalents of its Profemur R Revision Hip System devices were a modular hip stem-neck combination that were both titanium and modular in the same neck-stem location as the Profemur devices.

84.     In its 510(k) Premarket Notification applications to distribute its titanium Profemur modular necks in the United States, Wright Medical did not disclose to the FDA that there had been clinical failures in the form of fractures of the modular necks "designed by Cremascoli in 1985."

85.     The FDA did not test the safety or efficacy of the Profemur R Revision hip stem, nor the titanium Profemur modular neck as a part of the 510(k) review process.

86.     On December 13, 2000, Wright Medical Technology, Inc., received clearance from the FDA to market the PRO-FEMUR R Revision Hip System in the United States.

87.     After Wright Medical filed its 510(k) Premarket Notification application to distribute its Profemur modular necks in the United States, Wright Medical had a duty to report to the FDA any instances it knew of, or received notice of, a clinical failure in the form of a fracture in a patient of a modular neck that it had distributed.

88.     The FDA itself did not test in a laboratory the safety or efficacy of the Profemur® R Revision Hip System stem, nor the accompanying titanium Profemur® modular necks, as a part of the Abbreviated 510(k) process.

89.     Sometime after December 13, 2000, Defendant Wright Medical Technology, Inc., began to design, manufacture, label, market, promote, distribute, and sell in the United States the Wright Medical Profemur® Total Hip System and its components.

90.     Sometime after December 13, 2000, Defendant Wright Medical Technology, Inc., began to design, manufacture, label, market, promote, distribute, and sell in the United States Wright Medical titanium Profemur® Modular Necks.

14

91.     On March 11, 2002, Wright Medical Technology, Inc., filed an application with the United States Patent and Trademark Office to register the trademark "PROFEMUR" in the United States.   [See: U.S. Trademark Registration Number: 76380670.]

92.     The Wright Medical Profemur modular necks, marketed, distributed and sold in the United States after December 13, 2000, and before August 25, 2009, for use with various Wright Medical hip stems, were manufactured in various models or styles, six of those were identified by Wright Medical as "short" necks (i.e., Ref. #s PHA0-1202, PHA0-1212, PHA0-1222, PHA0-1232, PHA0-1242, and PHA0-1252), and six were identified by Wright as "long" necks (i.e., Ref. #s PHA0-1204, PHA0-1214, PHA0-1224, PHA0-1234, PHA0-1244, and PHA0-1254).

93.     Sometime after December 13, 2000, Wright Medical began to import, manufacture, label, market, promote, distribute, and sell in the United States the Wright Medical Profemur R Revision Hip System, including the titanium Profemur modular necks.

94.     The Wright Medical Profemur modular necks that were distributed in the United States after December 13, 2000, and before August 25, 2009, were all made of a titanium- aluminum-vanadium alloy known as Ti6A14V.

95.     After December 13, 2000, Wright Medical applied for and received FDA 510(k) clearance for various other models or designs of Profemur Hip Stems.

96.     In April of 2002, Wright Medical applied for a 510(k) clearance to distribute in the United States what it called the STEM Hip Replacement System, to be used with its titanium Profemur Modular Necks that had previously been cleared for distribution in the United States.

97.     In the Wright Medical 510(k) application for the STEM Hip Replacement System, the only other artificial hip stem product that Wright Medical represented to be the substantial equivalent of the STEM Hip Replacement System that was modular at the neck-stem junction was its own Profemur R Hip Revision System.

98.     At the time Wright Medical applied for a 510(k) clearance to distribute in the United States the STEM Hip Replacement System, the Profemur R Hip System had been distributed in the United States for less than four months.

99.     On July 2, 2002, the FDA granted Wright Medical's application for a 510(k) clearance to distribute in the United States the STEM Hip Replacement System with its titanium Profemur Modular Necks.

100.    The FDA clearance that Wright Medical received for its STEM Hip Replacement System is known and identified as K021346.

101.    Wright Medical subsequently renamed or rebranded the STEM Hip Replacement System as the Profemur Z hip stem.

102.    Over time Wright Medical expanded the Profemur® prosthetic hip stem product line to include additional designs of Profemur® Stems, including hip stems branded with names such as the Profemur® Z Hip Stem, Profemur® Plasma Z Hip Stem, Profemur® LX Hip Stem, and the Profemur® TL Hip Stem, among others.

103.    The Profemur Z hip stem as cleared by the FDA for distribution in the United States on July 2, 2002, was not a plasma coated hip stem.

104.    Wright Medical designed and manufactured a plasma coated Profemur Z hip stem, which it branded as the Profemur Z Plasma hip stem, and/or the Profemur Plasma Z hip stem.

105.    Wright Medical has never received a 510(k) clearance from the FDA to distribute in the United States the Profemur Plasma Z hip stem for use with titanium Profemur Modular Necks.

106.    After January 13, 2000, Defendant Wright Medical began to describe its Profemur® hip devices to its distributors, sales representatives, and surgeons, in printed brochures that it created, copywrote, and distributed, known as "Technical Monographs."

107.    After January 13, 2000, Defendant Wright Medical began to describe its Profemur® hip devices to its distributors, sales representatives, and surgeons, on and through internet website pages that it created, copywrote, and controlled.

108.    After January 13, 2000, Defendant Wright Medical began to market its Profemur® hip devices to the general public, on and through internet website pages that it created, copywrote, and controlled.

109.    In Technical Monographs material created, copywritten, and distributed by Wright Medical beginning in approximately the year 2002, and continuing into the year 2005, Wright Medical made the following representations, statements, and claims about its Profemur® modular necks:

> The modular neck used with the Profemur® Hip has been employed by Wright Cremascoli for over 15 years.  The necks were designed in 1985 and have been successfully implanted in over 50,000 patients requiring both primary and revision hip procedures.  The necks are used in other Wright Cremascoli hip systems besides the Profemur® Hip.  None of the necks has experienced a clinical failure since their inception.

[e.g., Wright Medical Technical Monograph MH688-102 © 2002, and © 2004.]

110.    The modular necks which Wright Medical represented in literature distributed in the United States at its first marketing of these devices as having been "designed by Cremascoli in 1985," and "successfully implanted in over 50,000 patients," were the original modular neck design of Cremascoli that existed prior to the 1999 re-design.

111.    The modular necks which Wright Medical represented in literature distributed in the United States at its first marketing of these devices as having been "designed by Cremascoli in 1985," and represented that "none of the necks has experienced a clinical failure since their inception," were the original modular neck design that existed prior to the 1999 re-design.

112.    Prior to the year 2002, Cremascoli received notice of clinical failures [i.e., failures in patients] in the form of fractures of its modular necks that had been "designed by Cremascoli in 1985."

17

113.    Prior to the year 2002 Wright Cremascoli Ortho received notice of clinical failures in the form of fractures of the modular necks that had been "designed by Cremascoli in 1985."

114.    Prior to the year 2002 Wright Medical received notice of clinical failures in the form of fractures of its modular necks that had been "designed by Cremascoli in 1985."

115.    In the years 2003 and 2004, Wright Cremascoli Ortho received notice of clinical failures in the form of fractures of the modular necks that had been "designed by Cremascoli in 1985."

116.    In the years 2003 and 2004, Wright Medical received notice of clinical failures in the form of fractures of the modular necks that had been "designed by Cremascoli in 1985."

117.    Wright Medical knew that the above quoted statement by Wright Medical that, "None of the necks has experienced a clinical failure since their inception," was false when first made.

118.    Prior to December 1, 2008, Wright Medical never corrected or recanted the above quoted statement by Wright Medical, "None of the necks has experienced a clinical failure since their inception."

119.    In various Technical Monographs created, copywritten, and distributed by Wright Medical beginning in approximately the year 2002, and continuing into the year 2005, Wright Medical made the following representations, statements, and claims about its Profemur® modular necks:

> The modular neck system, designed by Cremascoli in 1985 (U.S. Patent # 4,957,510), has now been successfully implanted in over 50,000 patients requiring both primary and revision hip arthroplasty.  Extensive laboratory tests have proven that the coupling between the modular neck and femoral implant guarantees:
>
> - Structural reliability
> - Absence of significant micromovement
> - Absence of fretting corrosion

[e.g., Wright Medical Technical Monograph MH688-102 © 2002, and © 2004.]

120.   The above quoted statement by Wright Medical that it, "guaranteed . . . absence of fretting corrosion," with its Profemur® modular necks was false at the time it was first made.

121.   Wright Medical has never corrected or recanted the above quoted statement that it, "guaranteed . . . absence of fretting corrosion," with its Profemur® modular necks.

122.   In various marketing and informational material published and distributed by Wright Medical, and available to Wright Medical's sales representatives and distributors, surgeons, patients and the general public, Wright Medical made representations, statements, and claims about its Conserve®, Dynasty®, and Profemur® hip product lines that these products were intended for patients who wanted to return to an "active lifestyle."

123.   In marketing and informational material published and distributed by Wright Medical, and available to Wright Medical's sales representatives and distributors, surgeons, patients and the general public, Wright Medical made representations, statements, and claims about its Conserve®, Dynasty®, and Profemur® hip product lines that these products were intended for patients who wanted to return to and engage in various sporting, athletic, and lifestyle activities, such as golf, tennis, running, dirt bike racing, wrestling, active military duty, karate, skydiving and heavy labor.

124.   In marketing and informational material published and distributed by Wright Medical, and available to Wright Medical's sales representatives and distributors, surgeons, patients and the general public, Wright Medical made representations, statements, and claims about its Conserve®, Dynasty®, and Profemur® hip product lines that these products had been implanted in patients who had returned to or engaged in various sporting, athletic, and lifestyle activities, such as golf, tennis, running, dirt bike racing, wrestling, active military duty, karate, skydiving and heavy labor.

125.   Patient Testimonials, also at times called "Patient Stories," that have appeared on the Wright Medical website, and were available to Wright Medical sales representatives, distributors, physicians, patients, and the public in and after the year 2005,

and/or that appeared in printed materials published by Wright Medical from 2005 into the year 2012, represented patients who received Wright Medical artificial hips have already returned or are about to return to such activities as running, jogging, snow skiing, water skiing, marathon running, tennis, racquetball, golf, horseback riding, work that involves lifting and moving of heavy objects, active military duty in Iraq, karate, competitive wrestling, skydiving, and competitive motocross racing, among other activities.

126.   Some of the Patient Testimonials [a/k/a Patient Stories] that have from time to time appeared on the Wright Medical Website, and in printed materials published by Wright Medical from 2005 into the year 2012, have been from men weighing more than 250 lbs. who had received a titanium Profemur modular neck.

127.   In various marketing and informational material published and distributed by Wright Medical, and available to Wright Medical's sales representatives and distributors, surgeons, patients and the general public, Wright Medical made representations, statements, and claims about its Conserve® and Profemur® hip product lines that these products were expected to last 10 to 15 years.

128.   In marketing its Conserve®, Dynasty®, and Profemur® hip product lines to surgeons, one or more Wright Medical sales representatives made representations to one or more surgeons that Wright Medical Conserve®, Dynasty®, and Profemur® hip products were expected to last at least 20 years.

129.   In publications copywritten in the year 2002, that Wright Medical distributed for its marketing of its Profemur hip devices, it stated its Profemur modular necks as having been "designed by Cremascoli in 1985," and "successfully implanted in over 50,000 patients," a time frame and number of implants that included the original modular neck design that existed prior to the 1999 re-designed [PHA0] modular necks.

130.   Prior to the year 2000, Cremascoli had received notice of clinical failures in the form of fractures of its modular necks that had been "designed by Cremascoli in 1985."

20

131.   Prior to the year 2000, Wright Medical had received notice of clinical failures in the form of fractures in Europe of the modular necks that had been "designed by Cremascoli in 1985."

132.   Once Wright Medical filed a 510(k) Premarket Notification application to distribute its Profemur® modular necks in the United States, Wright Medical had a duty to report to the FDA any, each, and all events it received notice of where it was claimed that there had been a fracture in a patient of a Profemur® modular neck.

133.   Once Wright Medical received clearance to distribute titanium Profemur® modular necks in the United States as a result of its 510(k) Premarket Notification application, Wright Medical had a duty to report to the FDA any, each, and all events it received notice of where it was claimed that there had been a fracture in a patient of a Profemur® modular neck.

134.   Prior to January of 2005, Wright Medical knew of or received notice of fractures in patients of Profemur® modular necks that had been "designed by Cremascoli in 1985".

135.   Prior to April 19, 2005, Wright Medical did not report to the FDA any of the events it received notice of that a Profemur® modular neck had fractured in a patient.

136.   On or about April 19, 2005, Wright Medical first reported to the FDA that it had received notice that a Profemur® modular neck implanted in a patient had fractured.

137.   After receiving notice of a 2005 Profemur® modular neck fracture, Wright Medical received notice of additional Profemur® modular neck fractures in patients.

138.   After receiving notice of the January 2005 Profemur modular neck fracture in Europe, Wright Medical received notice of additional Profemur modular neck clinical failures in Europe, Canada, and the United States, where the modular neck implanted in a patient had fractured at its oblong taper, where the oblong taper seats in the pocket of the stem.

139.   The number of reported titanium Profemur® modular neck fractures have continued to increase each year since fractures were first reported.

140.   Through March 31, 2018, there have been 768 Profemur modular neck fractures.   [11/06/2018 Transcript, pg. 13, U.S.D.C., Colorado, *Applekamp v. Wright Medical*, Case No. 17- cv-01601.]   Since that date additional Profemur modular neck fractures have occurred.

141.   Prior to December 1, 2008, Wright Medical did not inform all orthopedic surgeons in the United States known by it to have implanted its titanium Profemur® modular necks of the reports it had received of titanium modular necks fracturing.

142.   Prior to December 1, 2008, Wright Medical did not inform Plaintiff's orthopedic surgeon, Theodore P. Firestone, M.D., that it had received notice of titanium modular necks fracturing.

143.   On December 1, 2008, a "Safety Alert" was sent by Wright Medical to certain "medical professionals," which stated, in part, "[W]e have received reports of 35 modular neck failures as of November 21, 2008.   Initial investigations have revealed several commonalities in these failures: heavyweight males, long modular necks and patient activities such as heavy lifting and impact sports."

144.   At the time Wright sent its December 1, 2008 Safety Alert, Wright Medical in fact was aware of more than 35 titanium modular neck failures (by fracture of a Profemur® modular neck) as of November 21, 2008, if all of the modular neck fractures back to the year 1985 that had been reported to Cremascoli and to Wright Medical were included in the total.

145.   In the FDA Guidance Documents for Femoral Stem Prostheses DRAFT, dated August 1, 1995, available to industry at the time Wright Medical submitted its Abbreviated 510(k) clearance application for the Pro-Femur R Revision Hip System, the section titled "Contraindicated Weight Limit(s)", stated, in part, "labeling by contraindication as not for use in patients above a certain weight."

146.   In Wright Medical's Instructions for Use [hereinafter "IFU"] that accompanied the Profemur® hip devices distributed in the United States from the date of their introduction into the United States, through June of 2009, Wright stated the use of

these devices to be contraindicated in "obese" patients, "[W]here obesity is defined as three times normal body weight."

147.    Prior to August 2010, Wright Medical did not, in its IFUs for the Profemur® hip devices include a warning, precaution or other advisory as to the use of any of its Profemur® modular necks in people who weighed more than a specifically stated patient body weight.

148.    In its IFUs for the Profemur® hip devices Wright Medical has never included a warning, precaution or other advisory as to the use of any of its Profemur® modular necks in people who had a body mass index [BMI] at or above a certain number.

149.    Wright Medical has never stated in its IFUs for the Profemur® hip devices that the use of any of its Profemur® modular necks was contraindicated in heavyweight males.

150.    Wright Medical has never stated in its IFUs for the Profemur® devices that the use of any of its Profemur® modular necks was contraindicated in patients who engaged in heavy lifting.

151.    Wright Medical has never stated in its IFUs for the Profemur® devices distributed in the United States that the use of any of its modular necks was contraindicated in patients who engaged in impact sports.

152.    The IFU for Wright Medical Profemur® devices distributed in the United States was the same IFU document used for some other Wright Medical hip stem devices that did not use Profemur® Modular necks and were not modular in the region of the artificial femoral neck.

153.    At no time did Wright Medical state in its IFUs that the rate of failure by fracture of the implant was higher for its Profemur® modular neck hip devices, compared to the rate of failure by fracture for other Wright Medical stem hip devices that did not use modular necks, but were subject to the same IFU document.

154.    Even though some Wright Medical IFUs for the Profemur® devices in use prior to August 2010 contained a section titled, "Conditions presenting increased risk of

failure include. . . ," that section of the IFU did not state that patients who weigh more than a certain patient body weight, or have a BMI at or above a certain number, or engage in a high level of physical activity, or engage in heavy lifting, or engage in impact sports, would be at an increased risk of failure (by fracture) of the modular neck component, when compared to the risk of failure for other Wright Medical hip stem devices using that same IFU document but that did not use modular necks.

155.   Even though some Wright IFUs for the Profemur® devices in use prior to August 2010 contained a section titled "Warning," and a subsection within titled "Modular Necks," Wright Medical did not state therein that patients weighing more than a certain patient body weight, or with a BMI at or above a certain number, or who engage in a high level of physical activity, or engage in heavy lifting, or engage in impact sports, would be at an increased risk of failure (by fracture) of the modular neck component when compared to the risk of failure (by fracture) for other Wright Medical hip stem devices using that same IFU document but that did not use modular necks.

156.   Even though some Wright IFUs for the Profemur® hip devices in use prior to August 2010 contained a section titled "General Product Information," that stated, "An overweight or obese patient can produce high loads on the prostheses, which can lead to failure of the prosthesis," and, "If the patient is involved in an occupation or activity which includes substantial walking, running, lifting, or muscle strain, the resultant forces can cause failure of the fixation of the device, or both," Wright Medical did not state that patients involved in an occupation or activity that included those activities created any higher risk of failure (by fracture) of the modular neck component when compared to the risk of failure (by fracture) for other Wright Medical hip stem devices using that same IFU document but that did not use modular necks.

157.   Prior to August 2010 Wright Medical did not change the language in its IFUs for its Profemur® devices to address the issue of any specific patient body weight or activity levels related to the potential for a modular neck fracture.

158.    Between the dates of December 13, 2000, and August 25, 2009, all of the Profemur® modular necks distributed by Wright Medical were made of a titanium alloy, generally known as Ti6Al4V.

159.    After Profemur® Modular Necks began to be implanted, Cremascoli and Wright Medical began to receive reports of its titanium Profemur® modular necks having fractured at the oblong taper (distal end) where it is seated in the "pocket" of the stem.

160.     Prior to July 30, 2010, Wright Medical came to the conclusion that, "Higher than normal rates of early failure of the long offset PROFEMUR® Titanium Modular Necks have been observed for heavyweight (>230 lbs.) patients."

161.    Prior to July 30, 2010, case studies appeared in medical journals reporting the fracture of Wright Medical titanium Profemur® modular necks.

162.    Wright Medical titanium Profemur® Modular Necks fractured at the neck-stem junction because they were:

    a.    Inadequately designed for the patient population for which they were marketed;

    b.    Not designed to withstand the stress and loads that they would reasonably be expected to be subjected to after implantation;

    c.    Not designed to meet the performance requirements of published applicable industry standards; and,

    d.    Not designed with the performance characteristics that had been represented to surgeons by Wright Medical, and its sales force.

163.    As the number of reported Wright Medical titanium Profemur® modular neck fractures continued to increase, surgeons who had been implanting these devices began to question the safety of these devices.

164.    After Wright Medical sent the December 1, 2008, "Safety Alert" informing surgeons of Profemur modular neck fractures, some surgeons who had been implanting these devices stopped using the Wright Medical titanium modular necks.

165.    After Wright Medical sent the December 1, 2008, "Safety Alert" informing surgeons of Profemur modular neck fractures, sales of its Profemur® hip devices in the United States began to decline.

166.    As the number of reported Wright Medical titanium Profemur® modular neck fractures continued to increase, Wright Medical did not acknowledge to surgeons or to the FDA that titanium Profemur® modular neck fractures were a result of a defective design.

167.    As the number of reported Wright Medical titanium Profemur® modular neck fractures continued to increase, Wright Medical did not acknowledge to surgeons or to the FDA that titanium Profemur® modular neck fractures that were occurring were a result of an inadequate design for the intended patient population in which that they had been marketed to surgeons as appropriate for.

168.    As the number of reported Wright Medical titanium Profemur® modular neck fractures continued to increase, Wright Medical engaged in a campaign of concealment, misinformation, deceit, and fraud, misrepresenting to surgeons the facts and truth as to the numbers, rates, and reasons for its Profemur® modular neck fractures.

169.    As the number of reported Wright Medical titanium Profemur® modular neck fractures continued to increase, Wright Medical did not inform all surgeons using these products the fracture rates or fracture numbers associated with each of the various versions of its Profemur modular necks.

170.    As the number of reported Wright Medical titanium Profemur® modular neck fractures continued to increase, Wright Medical did not inform Plaintiff's surgeon which versions of is Profemur modular necks had the highest numbers of fractures, and the highest rate of fractures, of these modular necks.

171.    The titanium Profemur modular neck is designed in a way that after implantation in a patient it is subject to micromotion and fretting corrosion at a point of

26

high loading and stress, thereby increasing the potential for structural failure due to fatigue failure and fracture of the oblong taper at the distal end of the modular neck at or near the neck-stem junction.

172.   The titanium Profemur modular neck is manufactured in a way that after implantation in a patient it is subject to micromotion and fretting corrosion at a point of high loading and stress, thereby increasing the potential for structural failure due to fatigue failure and fracture of the oblong taper at the distal end of the modular neck, at or near the neck-stem junction.

173.   The titanium Profemur modular neck is designed in a way that after implantation in a patient it is subject to structural failure due to fatigue failure and fracture of the oblong taper at the distal end of the modular neck at or near the neck-stem junction as a result of being subjected to the normal and expected activities of daily living.

174.   The Profemur Hip System in general, and the titanium Profemur modular neck implanted in Plaintiff Lawrence E. Meyers, was not merchantable, and was defective and unreasonably dangerous for its intended and/or reasonably foreseeable uses in that:

      A.   It was and is defective and unreasonably dangerous under Arizona product liability law as a result of one or more of a combination of the following:

            (1)   the Profemur Hip System was designed in such a way that the point of highest stress on the modular neck is at the neck-stem junction;

            (2)   the Profemur Hip System was designed in such a way that the modular neck was subject to micromotion and fretting corrosion at its point of highest stress, thereby increasing the potential for failure by fatigue fracture;

            (3)   the surface of the section of the neck that was inserted into the femoral stem was designed in such a manner as to increase the potential for fretting and corrosion and failure;

(4)    the portion of the neck that was inserted in the femoral stem was in a narrow, confined space, thereby increasing the potential for fretting, corrosion, and failure;

(5)    the components were designed in such a way as to make the modular neck component more susceptible to fretting and corrosion than other existing alternative products, thereby increasing the potential for failure;

(6)    the components were designed in such a way as to make the modular neck component more susceptible to fatigue failure and fractures than other existing alternative products;

(7)    the risk of neck fracture outweighed the utility of the device, considering other technically feasible alternatives, and other already existing alternative products;

(8)    a reasonably prudent manufacturer and/or seller, given knowledge of the product's condition, would not have marketed, or sold the product;

(9)    the manufacturer and/or seller failed to have properly warned of the alleged defects in the alleged device as stated herein; and,

(10)    there may be other conditions or defects yet to be determined.

B.    It was defective and unreasonably dangerous in that it failed to perform as safely as an ordinary consumer would expect when the product is used in a reasonable, foreseeable manner and thereby unreasonably dangerous to an extent beyond which would be contemplated by the ordinary consumer with ordinary knowledge common to the community as to its characteristics, in that:

(1)     the ordinary consumer would not contemplate that the ordinary activities of daily living would result in the catastrophic structural failure of the titanium modular neck;

(2)     the ordinary consumer would not contemplate that the titanium modular neck would catastrophically structurally fail as a result of being used in the manner and for activity levels that Wright Medical intended; and,

(3)     the ordinary consumer would not contemplate that the titanium modular neck would catastrophically structurally fail as a result of being used in the manner and for activity levels that Wright Medical posted on its website as "Patient Testimonials" and "Patient Stories".

175.   The titanium Profemur modular neck is not designed to withstand the normal activities of daily living after implantation without catastrophic structural failure of the titanium modular neck from a fatigue fracture during the expected useful life of that component.

176.   The titanium Profemur modular neck is not designed to withstand the normal activities of daily living after implantation in "heavyweight" patients, as Wright Medical defined and used that term, without catastrophic structural failure of the titanium modular neck from a fatigue fracture during the expected useful life of that component.

177.   The titanium Profemur modular neck is not designed to withstand the activities of "high impact sports," as Wright Medical defined and used that term, without catastrophic structural failure of the titanium modular neck from a fatigue fracture during the expected useful life of that component.

178.   The titanium Profemur modular neck is not designed to withstand the activities of patients "involved in an occupation or activity which includes substantial walking, running, lifting, or muscle straining," as Wright Medical defined and used those

terms, without catastrophic structural failure of the titanium modular neck from a fatigue fracture during the expected useful life of that component.

179.   The titanium Profemur modular neck was not designed to withstand the forces that were known would be encountered in the normal activities of daily living for all of the patient population that the product was intended for, without catastrophic structural failure of the titanium modular neck from a fatigue fracture during the expected useful life of that component.

180.   The titanium Profemur modular neck was not designed to withstand the forces that were known would be encountered in the normal activities of daily living for all of the patient population that the product was marketed for, without catastrophic structural failure of the titanium modular neck from a fatigue fracture during the expected useful life of that component.

181.   The titanium Profemur modular neck was not designed to withstand the forces that were known would be encountered in the normal activities of daily living, without catastrophic structural failure of the titanium modular neck from a fatigue fracture during the expected useful life of that component, for some of the people who appeared on Wright Medical's web site "Patient Testimonials" and "Patient Stories" web pages.

182.   The titanium Profemur modular neck was not designed to withstand the forces, without catastrophic structural failure of the titanium modular neck from a fatigue fracture during the expected useful life of that component, and that were expected would be encountered in the activities of daily living of Jimmy Connors, a professional tennis player, who, after his hip replacement surgery, was compensated by Wright Medical to be a spokesperson on behalf of Wright Medical artificial hip products.

183.   The titanium Profemur modular neck was not designed to withstand the forces, without catastrophic structural failure of the titanium modular neck from a fatigue fracture during the expected useful life of that component, that were known would be encountered in the activities of daily living of Ramon Garcia, who, after his hip

replacement surgery, provided a "Patient Testimonial" on behalf of Wright Medical, that shows him jumping from the side of his pick-up truck.

184.   The titanium Profemur modular neck was not designed to withstand the forces, without catastrophic structural failure of the titanium modular neck from a fatigue fracture during the expected useful life of that component, that were known would be encountered in the activities of daily living of Roger Klein, who, eight weeks after hip replacement surgery returned to work "lifting and moving heavy objects," and who, after his hip replacement surgery, provided a "Patient Testimonial" on behalf of Wright Medical.

185.   The titanium Profemur modular neck was not designed to withstand the forces, without catastrophic structural failure of the titanium modular neck from a fatigue fracture during the expected useful life of that component, that were known would be encountered in the activities of daily living of Evelyn, a marathon runner and dirt bike rider, who, after his hip replacement surgery, provided a "Patient Story" on behalf of Wright Medical, and appeared on the cover of the Wright Medical Group, Inc., 2010 Annual Report, sitting on a dirt bike.

186.   The titanium Profemur modular neck was not designed to withstand the forces, without catastrophic structural failure of the titanium modular neck from a fatigue fracture during the expected useful life of that component, that were known would be encountered in the activities of daily living of Lawrence (a/k/a "Larry"), who weighed more than 230 lbs. at the time of his implant surgery, and who, after his hip replacement surgery, provided a "Patient Story" on behalf of Wright Medical.

187.   The titanium Profemur modular neck was not designed to withstand the forces, without catastrophic structural failure of the titanium modular neck from a fatigue fracture during the expected useful life of that component, that were known would be encountered in the activities of daily living of Kevin, who weighed more than 230 lbs. at the time of his implant surgery, and who, after his hip replacement surgery, provided a "Patient Story" on behalf of Wright Medical.

188.    The titanium Profemur modular neck was not designed to withstand the forces, without catastrophic structural failure of the titanium modular neck from a fatigue fracture during the expected useful life of that component, that were known would be encountered in the activities of daily living of Plaintiff in this case.

189.    Wright Medical marketed and promoted its Conserve® and Profemur® artificial hips as appropriate for persons who wanted to return to an active lifestyle, which was a material consideration by Plaintiff Lawrence E. Meyers in choosing to have artificial hip surgery.

190.    The titanium Profemur modular neck was not tested in design and development at the level of forces that would be equivalent to the forces it would be subjected to in the activities of living in the patient population that Wright Medical marketed these devices for use in.

191.    The titanium Profemur modular neck was not tested in design and development at the level of forces that would be equivalent to the forces it would be subjected to in the normal activities of daily living of "heavyweight" patients, as Wright Medical defined and used that term.

192.    The titanium Profemur modular neck was not tested in design and development at the level of forces that would be equivalent to the forces it would be subjected to in the reasonably expected activities of patients who engaged in "high impact sports," as Wright defined and used that term.

193.    The titanium Profemur modular neck was not tested in design and at the level of forces that would be equivalent to the forces it would be subjected to in the reasonably expected activities of patients "involved in an occupation or activity which includes substantial walking, running, lifting, or muscle straining," as Wright defined and used those terms.

194.    The titanium Profemur modular neck was not tested for the FDA Section 510(k) Premarket Notification Process at the level of forces that were known would be

encountered in the activities of daily living of the patient population that Wright Medical intended to market these devices for use in.

195.   The titanium Profemur modular neck was not tested for the FDA Section 510(k) Premarket Notification Process at the level of forces that were known would be encountered in the normal activities of daily living of active patients, as Wright Medical defined and used that term.

196.   The titanium Profemur modular neck was not tested for the FDA Section 510(k) Premarket Notification Process at the level of forces that were known would be encountered in the activities of patients who engaged in "high impact sports," as Wright defined and used that term.

197.   The titanium Profemur modular neck was not tested for the FDA Section 510(k) Premarket Notification Process at the level of forces that were known would be encountered in the activities of patients "involved in an occupation or activity which includes substantial walking, running, lifting, or muscle straining," as Wright defined and used those terms.

198.   The titanium Profemur modular neck was not tested for the FDA section 510(k) Premarket Notification Process at the forces equal to the level of activities of patients that Wright Medical subsequently marketed these devices for use in.

199.   Wright Medical marketed the Ti Profemur modular neck as a part of the PROFEMUR® Modular Hip System, which had been designed in 1985.

200.   The products, documents, and records that existed at and within Cremascoli Ortho Group were acquired by Wright Medical when it acquired Cremascoli Ortho on December 22, 1999.

201.   On December 22, 1999, the Ti Profemur modular neck was known by Cremascoli Ortho to have sustained structural failures by fractures of the modular neck.

202.   By the date of December 22, 1999, Cremascoli Ortho knew of fractures of its Ti Profemur modular necks which had occurred prior to that date.

203.    By the date of December 22, 1999, Cremascoli Ortho knew of fractures of its Ti Profemur modular necks which had occurred due to micromotion and fretting corrosion.

204.    By the date of the first 510(k) application for a Profemur product by Wright Medical, there had been fractures of Ti Profemur modular necks known to Wright Medical to have occurred prior to September 26, 2000.

205.    By the date of the first 510(k) application for a Profemur product by Wright Medical, there had been fractures of Ti Profemur modular necks known to Wright Medical to have occurred prior to September 26, 2000 as a result of micromotion and fretting corrosion.

206.    Between the years 1985 and September 26, 2000 (the date Wright Medical first applied for a 510(k) clearance from the FDA to distribute a Profemur device in the United States), there had been fractures of Ti Profemur modular necks known to Cremascoli Ortho.

207.    Between the years 1985 and September 26, 2000 (the date Wright Medical first applied for a 510(k) clearance from the FDA to distribute a Profemur device in the United States), there had been fractures of Ti Profemur modular necks known to Cremascoli Ortho as a result of micromotion and fretting corrosion.

208.    Between January 1, 2000, and September 26, 2000 (the date Wright Medical first applied for a 510(k) clearance from the FDA to distribute a Profemur device in the United States), there had been fractures of Ti Profemur modular necks known to Wright Cremascoli Ortho.

209.    Between January 1, 2000, and September 26, 2000 (the date Wright Medical first applied for a 510(k) clearance from the FDA to distribute a Profemur device in the United States), there had been fractures of Ti Profemur modular necks known to Wright Cremascoli Ortho as a result of micromotion and fretting corrosion.

210.    Surgeons, as the "learned intermediary" who selected and implanted these devices, had a right to know that fractures of Wright Medical Ti Profemur modular necks

had occurred, so that they could consider that information in deciding whether or not to choose these devices for implantation in a particular patient.

211.    Prior to November 2005 fractures of Ti Profemur modular necks had occurred.

212.    Prior to November 2005 Wright Medical did not inform Plaintiff's surgeon, Dr. Firestone, that any fractures of its Ti Profemur modular necks had occurred.

213.    Prior to December 2007 the local distributor of Wright Medical hip products did not inform Plaintiff's surgeon, Dr. Firestone, that any fractures of its Ti Profemur modular necks had occurred.

214.    Prior to the implant of the Ti Profemur modular neck in Plaintiff in December 2007 Wright Medical did not warn patients, surgeons, hospitals, customers, or its local distributors and field representatives, that the neck component of these devices was known to be failing from structural failure by fracture of the modular neck.

215.    Prior to December 1, 2008, Wright Medical did not inform all surgeons, as the "learned intermediary" who selected and implanted these devices, that fractures of Wright Medical Ti Profemur modular necks had occurred.

216.    The Ti Profemur modular neck was known by Wright Medical to be failing at "higher than normal rates of early failure," as Wright Medical defined and used that term, from structural failure by fracture of the modular neck.

217.    Wright Medical did not warn patients that the Ti Profemur modular neck was known to be suddenly and catastrophically failing from structural failure by fracture of the modular neck during normal activities of daily living.

218.    Wright Medical did not warn patients that the Ti Profemur modular neck was known to be suddenly and catastrophically failing from structural failure by fracture of the modular neck in high activity patients.

219.    Wright Medical did not warn surgeons that the Ti Profemur modular neck was known to suddenly and catastrophically fail from structural failure by fracture of the modular neck in patients who weighed less than 225 lbs.

220.    Wright Medical did not warn surgeons that the Ti Profemur modular neck was known to suddenly and catastrophically fail from structural failure by fracture of the modular neck in patients who had not engaged in high levels of activity.

221.    Wright Medical did not warn patients that the Ti Profemur modular neck was known to suddenly and catastrophically fail from structural failure by fracture of the modular neck in patients who weighed less than 225 lbs.

222.    Wright Medical did not warn patients that the Ti Profemur modular neck was known to suddenly and catastrophically fail from structural failure by fracture of the modular neck in patients who had not engaged in high levels of activity.

223.    The Ti Profemur modular neck is of a design that it may suddenly and catastrophically fail when being used in accordance with the levels of activity and use by the patient population that it was marketed for by Wright Medical.

224.    The Ti Profemur modular neck is of a design that it may structurally fail by suddenly breaking into two pieces, often without any prior symptoms, notice or warning of impending failure.

225.    The Ti Profemur modular neck is of a design that it will structurally fail by suddenly breaking into two pieces, often without any prior symptoms, notice or warning of impending failure, when being used in reasonable and foreseeable ways.

226.    The Wright Medical hip system with the Ti Profemur modular neck was marketed by Wright Medical and the sales and marketing representatives Wright Medical trained, for uses and durability that exceeded its design and its structural limitations known to Wright Medical.

227.    The Wright Medical hip system with the Ti Profemur modular neck was marketed by Wright Medical and their trained representatives for uses and durability that exceeded their design, capabilities, and limitations as stated in the IFUs that Wright Medical published for these devices.

228.    Prior to the date of implant in Plaintiff, the Wright Medical hip system with the Ti Profemur modular neck was known by Wright Medical to be failing from structural

36

failure of the necks at a rate higher than the structural failure rate of the neck on stems of other comparable artificial hip systems readily available on the market that did not employ a modular neck design.

229.   Prior to the date of implant in Plaintiff, the Wright Medical hip system with the Ti Profemur modular neck was known by Wright Medical to be failing from structural failure of the modular necks at a rate higher than the structural failure rate of other comparable modular stem artificial hip systems readily available on the market that did not have a modular junction at the point where the neck joins the femoral stem.

230.   Prior to the date of implant in Plaintiff Wright Medical did not warn patients, surgeons, hospitals, customers, distributors, or the sales representatives it trained, that the femoral necks of its Profemur Hip System were fracturing at a rate higher than other comparable artificial hip systems readily on the market that did not employ a Ti Profemur modular neck design at the point of the femoral neck-stem junction.

231.   Prior to the date of implant in Plaintiff Wright Medical did not warn patients, surgeons, hospitals, customers, distributors, or the sales representatives it trained, that higher patient weight, and higher levels of patient activity, placed a patient at a higher risk of the Ti Profemur modular neck structurally failing by fracture.

232.   The Wright Medical hip system with the Ti Profemur modular neck is designed, manufactured, labeled, marketed, and promoted in such a way that it fails by the modular neck structurally failing [i.e., fractures] in substantially less time than is expected with other comparable devices readily available on the market.

233.   The Wright Medical hip system with the Ti Profemur modular neck is designed, manufactured, labeled, marketed, and promoted in such a way that it has a substantially higher rate of structure failure [i.e., modular neck fracture] than other comparable devices readily available on the market.

234.   After Wright Medical received notice that the Ti Profemur modular necks were failing from structural failure of the neck by fractures at "higher than normal rates of early failure," and at rates higher than other comparable hip systems, they did not timely

disclose that information to patients, surgeons, hospitals, customers, distributors, or the sales representatives it trained.

235.   After Wright Medical received notice that the Wright Medical hip system with the Ti Profemur modular neck was failing from the structural failure by fractures at "higher than normal rates of early failure," and at rates higher than other comparable hip systems, Wright Medical continued to market, distribute, and sell these devices to hospitals, surgeons, patients and other customers and consumers.

236.   After Wright Medical received notice that the Wright Medical hip system with the Ti Profemur modular neck was failing from structure failure of the modular neck by fractures at "higher than normal rates of early failure," and at rates higher than other comparable hip systems, they did not provide post-sale warnings to patients who had these devices implanted that included the following information:

    a.    The modular neck of their hip may suddenly and catastrophically structurally fail, without any warning, by breaking in two, when being used in normal activities of daily living;

    b.    If the modular neck of their hip did suddenly and catastrophically fail, it may cause them to fall, they would most likely not be able to get up, stand on that leg, or walk, and depending on where they were, and what they were doing, at the time of the failure, they could suffer serious injury or death;

    c.    These devices were structurally failing by fractures of the modular necks at "higher than normal rates of early failure" in patients of many different weights and levels of activity;

    d.    These devices were structurally failing by fractures of the modular necks at "higher than normal rates of early failure" in active patients;

    e.    These devices were structurally failing by fractures of the modular necks at "higher than normal rates of early failure" in heavyweight patients;

f.     These devices were structurally failing by fractures of the modular necks at "higher than normal rates of early failure" when being used by patients for work, recreation, and lifestyles that Wright Medical had marketed and advertised these devices as being appropriate for;

g.     In August of 2010 Wright Medical had modified the instructions for use that accompanied these products stating that for "heavyweight (>230 lbs.) . . .. Alternative devices, such as Cobalt Chrome modular necks and monoblock hip stems, may also be considered for these patients;" and,

h.     Wright stopped distribution of all of its Ti Profemur modular necks in the United States because of the unacceptably high structural failure rate.

237.    After Wright Medical received notice that the Wright Medical hip system with the Ti Profemur modular neck was failing from structural failure of the modular neck by fractures at "higher than normal rates of early failure," and at rates higher than other comparable hip systems, they did not request surgeons who implanted these devices to provide, at Wright Medical's expense, post-sale warnings to patients who had these devices implanted that included the following information:

a.     The modular neck of their hip may suddenly and catastrophically structurally fail, without any warning, by breaking in two, when being used in normal activities of daily living;

b.     If the modular neck of their hip did suddenly and catastrophically structurally fail, it may cause them to fall, they would most likely not be able to get up, stand on that leg, or walk, and depending on where they were, and what they were doing, at the time of the failure, they could suffer serious injury or death;

c.    These devices were structurally failing by fractures of the modular necks at "higher than normal rates of early failure" in patients of many different weights and levels of activity;

d.    These devices were structurally failing by fractures of the modular necks at "higher than normal rates of early failure" in active patients;

e.    These devices were structurally failing by fractures of the modular necks at "higher than normal rates of early failure" in heavyweight patients;

f.    These devices were structurally failing by fractures of the modular necks at "higher than normal rates of early failure" when being used by patients for work, recreation, and lifestyles that Wright Medical had marketed and advertised these devices as being appropriate for;

g.    In August of 2010 Wright Medical had modified the instructions for use that accompanied these products stating that for "heavyweight (>230 lbs.) . . .. Alternative devices, such as cobalt chrome modular necks and monoblock hip stems, may also be considered for these patients;" and,

h.    Wright stopped distribution of all Ti Profemur modular necks in the United States because of the higher than expected structural failure rate of that component.

## COUNT I – STRICT PRODUCT LIABILITY

233.    Plaintiffs incorporate by reference all foregoing paragraphs of this complaint, as if fully set forth herein, and further allege as follows.

234.    On and prior to December 2007, Defendant was engaged in the business of designing, manufacturing, marketing, distributing, labeling, and selling orthopedic hip implants and did design, manufacture, distribute, market, label and sell the artificial hip devices implanted in Plaintiff Lawrence E. Meyers in December of 2007 and March of 2008.

40

235.    Defendant had a duty to place into the stream of commerce, design, manufacture, distribute, market, promote, label, and sell the Metal-on-metal Conserve®–Dynasty®–Profemur® Hip System so that it was not defective and unreasonably dangerous when put to the use for which it was designed, manufactured, distributed, marketed, and sold.

236.    Defendant did in fact design, manufacture, sell, distribute, supply, label and/or promote the metal-on-metal Conserve®–Dynasty®–Profemur® Hip System to Plaintiff Lawrence E. Meyers and his implanting physician, Theodore P. Firestone, M.D.

237.    Defendant expected the metal-on-metal Conserve®–Dynasty®–Profemur® Hip System they designed and were selling, distributing, supplying, manufacturing, labeling and/or promoting to reach, and which did in fact reach, implanting physicians and consumers in the State of Arizona, including Plaintiff and his implanting physician, without substantial change in its condition.

238.    At the time the metal-on-metal Conserve®–Dynasty®–Profemur® Hip System left the possession of Defendant and at the time the metal-on-metal Conserve®–Dynasty®–Profemur® Hip System entered the stream of commerce, it was in an unreasonably dangerous and defective condition.  These defects include, but are not limited to, the following:

(a)    The metal-on-metal Conserve®–Dynasty®–Profemur® Hip System was not reasonably safe as intended to be used;

(b)    The metal-on-metal Conserve®–Dynasty®–Profemur® Hip System had an inadequate design for the purpose of hip replacement;

(c)    The metal-on-metal Conserve®–Dynasty®–Profemur® Hip System contained unreasonably dangerous design defects, including an inherently unstable and defective design which resulted in an unreasonably high probability of early failure;

(d)    The Profemur® Hip System contained unreasonably dangerous design defects, including an inherently unstable and defective design which

resulted in an unreasonably high probability of early failure by corrosion at the modular junctions;

(e) The Profemur® Hip System contained unreasonably dangerous design defects, including an inherently unstable and defective design which resulted in an unreasonably high probability of early failure by fracture of the modular neck;

(f) The metal-on-metal Conserve®–Dynasty®–Profemur® Hip System design puts the metal femoral ball directly in contact with the metal acetabular cup which produces a large amount of metal-on-metal wear debris;

(g) The metal-on-metal Conserve®–Dynasty®–Profemur® Hip System's unstable and defective design resulted in a hip prosthesis which had risks which exceeded the benefits of the medical device;

(h) The metal-on-metal Conserve®–Dynasty®–Profemur® Hip System has a propensity for the acetabular cup to detach, disconnect and/or loosen from the acetabulum;

(i) The metal-on-metal Conserve®–Dynasty®–Profemur® Hip System has a propensity to cause adverse patient reactions to high levels of metal debris generated by normal use of the metal-on-metal Conserve®–Dynasty®–Profemur® Hip System;

(j) The metal-on-metal Conserve®–Dynasty®–Profemur® Hip System's unstable and defective design resulted in a hip prosthesis which was more dangerous than the ordinary consumer would expect;

(k) The metal-on-metal Conserve®–Dynasty®–Profemur® Hip System failed to perform in a manner reasonably expected in light of its nature and intended function and subjected Plaintiff Lawrence E. Meyers to an unreasonable risk of harm beyond that contemplated by an ordinary person;

(l)   The metal-on-metal Conserve®–Dynasty®–Profemur® Hip System devices implanted in Plaintiff were defective in their manufacture and construction, in that they did not have adequate product specifications to control the manufacturing processes, resulting in the introduction of manufacturing defects, thereby creating a serious and unreasonable risk of injury by the failure of the metal-on-metal Conserve®–Dynasty®–Profemur® Hip System;

(m)   The metal-on-metal Conserve®–Dynasty®–Profemur® Hip System and individual components of the same may be defective in their manufacture in ways that have yet to be discovered, but which may be discovered as a result of future evaluation and/or testing of the explanted devices;

(n)   The metal-on-metal Conserve®–Dynasty®–Profemur® Hip System was insufficiently tested; and,

(o)   The labeling and warnings to Plaintiff Lawrence E. Meyers and Plaintiff's implanting physician about the dangers and risks of the metal-on-metal Conserve®–Dynasty®–Profemur® Hip System posed to consumers were inadequate, insufficient, and misleading. Examples of the inadequacy of Defendant's warnings include, but are not limited to, one or more of the following particulars:

   i.   The metal-on-metal Conserve®–Dynasty®–Profemur® Hip System contained warnings insufficient to alert Plaintiff and Plaintiff's physicians as to the risk of adverse events and/or reactions associated with the metal-on-metal Conserve®–Dynasty®–Profemur® Hip System subjecting Plaintiff to risks which exceeded the benefits of the metal-on-metal Conserve®–Dynasty®–Profemur® Hip System;

43

       ii.    The Conserve® Cup contained misleading warnings emphasizing the efficacy of the metal-on-metal Conserve®–Dynasty®–Profemur® Hip System while downplaying the risks associated with it, thereby making use of the metal-on-metal Conserve®–Dynasty®–Profemur® Hip System more dangerous than the ordinary consumer would expect;

       iii.    The metal-on-metal Conserve®–Dynasty®–Profemur® Hip System contained insufficient and/or incorrect warnings to alert consumers, including Plaintiff, through their prescribing physicians regarding the risk, scope, duration, and severity of the adverse reactions associated with the metal-on-metal Conserve®–Dynasty®–Profemur® Hip System;

       iv.    The metal-on-metal Conserve®–Dynasty®–Profemur® Hip System did not disclose that it was inadequately tested;

       v.    The metal-on-metal Conserve®–Dynasty®–Profemur® Hip System failed to convey adequate post-marketing warnings regarding the risk, severity, scope and/or duration of the dangers posed by the metal-on-metal Conserve®–Dynasty®–Profemur® Hip System; and,

       vi.    The metal-on-metal Conserve®–Dynasty®–Profemur® Hip System failed to contain instructions sufficient to alert consumers to the dangers it posed and to give them the information necessary to avoid or mitigate those dangers.

239.   At the time of Wright Medical's design, manufacture, importation, marketing, distribution, and sale of the metal-on-metal Conserve®–Dynasty®–Profemur® Hip System, feasible, alternative safer designs for the device were known and available to Wright Medical including, but not limited to, designs that utilized non-metal-on-metal articulating surfaces such as polyethylene on metal, or ceramic on ceramic articulating

surfaces, which are less likely to result in metal-on-metal wear debris, metal ions, corrosion at the modular junctions, fractures of the modular necks, and adverse symptomology related to the same.

240.   At the time of Wright Medical's design, manufacture, marketing, distribution, and sale of the metal-on-metal Conserve®–Dynasty®–Profemur® Hip System, feasible, alternative safer designs were known and available to Wright Medical including, but not limited to, designs that utilized non-metal-on-metal articulating surfaces such as polyethylene on metal, or ceramic on ceramic articulating surfaces, which are less likely to result in the emission of harmful metal debris, metal ions, and adverse symptomology related to the same.

241.   Had Defendant Wright Medical properly and adequately tested the metal-on-metal Conserve®–Dynasty®–Profemur® Hip System, they would have been discovered that the metal-on-metal Conserve®–Dynasty®–Profemur® Hip System would emit substantial metal debris and harmful metal ions and was certain to fail in numbers and rates significantly higher than expected and at rates higher than other available feasible, alternative hip devices.

242.   Plaintiff Lawrence E. Meyers used the metal-on-metal Conserve®–Dynasty®–Profemur® Hip System for its intended purpose, *i.e.*, hip replacement.

243.   Plaintiff Lawrence E. Meyers could not have discovered any defects with the metal-on-metal Conserve®–Dynasty®–Profemur® Hip System through the exercise of due care.

244.   Defendant, as designer, manufacturer, marketer, and distributor of medical devices is held to the level of knowledge of an expert in its field.

245.   Plaintiff and his implanting physician did not have substantially the same knowledge as Defendant who was the designer, manufacturer, or distributor of the metal-on-metal Conserve®–Dynasty®–Profemur® Hip System.

246.   The metal-on-metal Conserve®–Dynasty®–Profemur® Hip System is a defective and unreasonably dangerous product.  Defendant knew or should have known of

the dangerous condition of the product and therefore should not have marketed, sold, and/or placed it on the market.  A reasonably prudent manufacturer aware of the dangerous conditions posed by the product would not have marketed, sold, and/or placed these products on the market.

247.    As a direct and proximate result of Defendant's defective design, failure to properly warn, lack of quality control and other wrongful conduct, Plaintiff Lawrence E. Meyers has sustained and will continue to sustain permanent and severe physical injuries, severe emotional distress, mental anguish, economic losses, and other damages.  Plaintiff Lawrence E. Meyers has expended and may expend money in the future for medical bills and expenses.

248.    As a direct and proximate result of Defendant's wrongful conduct, Plaintiff Dawn Burstyn Meyers sustained and will continue to sustain the loss of consortium of her husband, Lawrence E. Meyers.

249.    Plaintiffs are entitled to compensatory damages against Defendant for strict products liability in an amount to be proven at trial, together with costs of this action.

## <u>COUNT II – NEGLIGENCE</u>

250.    Plaintiffs incorporate all foregoing paragraphs of this Complaint as if fully set forth herein and further allege as follows.

251.    At all times relevant, it was the duty of Defendant to exercise due care in designing, testing, manufacturing, distributing, labeling, marketing, promoting, and selling the metal-on-metal Conserve®–Dynasty®–Profemur® Hip System such that it would be reasonably safe for its intended use.

252.    Defendant's negligence in the designing, testing, manufacturing, labeling, distributing, marketing, promoting, selling, and failing to provide adequate warnings related to the metal-on-metal Conserve®–Dynasty®–Profemur® Hip System includes, but is not limited to, the following:

(a)    the metal-on-metal Conserve®–Dynasty®–Profemur® Hip System was negligently designed;

46

(b)    the metal-on-metal Conserve®–Dynasty®–Profemur® Hip System was negligently designed creating insufficient coverage of the femoral component;

(c)    the metal-on-metal Conserve®–Dynasty®–Profemur® Hip System was negligently designed and/or manufactured creating increased metal on metal wear between the femoral component and the acetabular component[1];

(d)    the Profemur® Hip System was negligently designed and/or manufactured creating increased corrosion at the modular junctions;

(e)    the Profemur® Hip System was negligently designed and/or manufactured creating increased risk of failure by fracture of the modular neck;

(f)    the metal-on-metal Conserve®–Dynasty®–Profemur® Hip System was negligently designed and/or manufactured creating increased metal corrosion[2];

(g)    the metal-on-metal Conserve®–Dynasty®–Profemur® Hip System was negligently designed and/or manufactured creating an unacceptable differential hardness of the cup and femoral head that is caused by among other things the technique and/or manner of the heat treatment of the femoral head and the acetabular cup[3];

---

[1] Langton DJ, Jameson SS, Joyce TJ, Hallab NJ, Natu S, Nargol AV, Early failure of metal-on-metal bearings in hip resurfacing and large-diameter total hip replacement: A consequence of excess wear. *J. Bone Join Surg* [Br]. 2010 Jan; 92(1):38-46.

[2] See generally Meftah, Morteza; Nicolaou, Nicos; Rodriguez, Jose A, Metal allergy response to femoral head-neck corrosion after total hip replacement. Current Orthopaedic Practice, September/October 2010, Vol. 21, Issue 5, pp. 530-533.

[3] Kinbrwn A, Unsworth A, The wear of high-carbon metal-on-metal bearings after different heat treatments. *Proc Ins Mech Eng H* 2008; 222:887-95.

47

(h)   Defendant committed manufacturing errors, including, but not limited to, component size tolerances out of specification and not within acceptable industry standards;

(i)   Defendant, in advertising, marketing, labeling, promoting, packaging, and selling the metal-on-metal Conserve®–Dynasty®–Profemur® Hip System negligently misrepresented material facts regarding its safety, efficacy and fitness for human use by claiming that the metal-on-metal Conserve®–Dynasty®–Profemur® Hip System was fit for its intended purpose when, in fact, it was not;

(j)   Defendant, in advertising, marketing, labeling, promoting, packaging, and selling the metal-on-metal Conserve®– Dynasty®–Profemur® Hip System, negligently misrepresented, and omitted, material facts regarding its safety, efficacy, and fitness for human use by claiming that metal-on-metal Conserve®–Dynasty®–Profemur® Hip System was adequately and reliably tested when, in fact, it had not;

(k)   Defendant, in advertising, marketing, labeling, promoting, packaging, and selling the metal-on-metal Conserve®–Dynasty®–Profemur® Hip System, negligently misrepresented, and omitted, material facts regarding its safety, efficacy, and fitness for human use by claiming that the metal-on-metal Conserve®–Dynasty®–Profemur® Hip System was safe and effective and was appropriate for use by human beings when, in fact, it was not;

(l)   Defendant, in advertising, marketing, labeling, promoting, packaging, and selling the metal-on-metal Conserve®–Dynasty®–Profemur® Hip System, negligently misrepresented, and omitted, material facts regarding its safety, efficacy, and fitness for human use by claiming the risk of serious adverse events and/or effects from the metal-on-

48

metal Conserve®–Dynasty®–Profemur® Hip System was comparable to that of other hip replacement systems when, in fact, it was not; and,

(m)   Defendant, in advertising, marketing, labeling, promoting, packaging, and selling the metal-on-metal Conserve®–Dynasty®–Profemur® Hip System, negligently misrepresented, and omitted, material facts regarding its safety, efficacy, and fitness for human use by claiming that the metal-on-metal Conserve®–Dynasty®–Profemur® Hip System had not caused or contributed to serious adverse events and/or effects requiring the premature explants of the device when, in fact, it had.

253.   Defendant knew or had reason to know that Plaintiff was a member of the general public for whose use the metal-on-metal Conserve®–Dynasty®–Profemur® Hip System was placed into interstate commerce, and who would be likely to use the metal-on-metal Conserve®–Dynasty®–Profemur® Hip System in a manner described in this Complaint.

254.   Defendant knew or reasonably should have known of the said product defects, inadequate or improper warnings and dangers associated with the manner and circumstances of Plaintiff's foreseeable use of the metal-on-metal Conserve®–Dynasty®–Profemur® Hip System, which would not be obvious to the general public.

255.   As a direct and proximate result of one or more of the foregoing wrongful acts or omissions by Defendant, the metal-on-metal Conserve®–Dynasty®–Profemur® Hip System caused Plaintiff to suffer and sustain injuries of a severe and permanent nature, severe emotional distress, mental anguish, economic losses and other damages. Plaintiff Lawrence E. Meyers has expended and may expend money in the future for medical bills and expenses.

256.   As a direct and proximate result of Defendant's wrongful conduct, Plaintiff Dawn Burstyn Meyers sustained and will continue to sustain the loss of consortium of her husband, Lawrence E. Meyers.

49

257.    Plaintiffs are entitled to recover compensatory damages against Defendant for negligence in an amount to be proven at trial, together with costs of this action.

### COUNT III – NEGLIGENT MISREPRESENTATION

258.    Plaintiffs incorporate by reference all foregoing paragraphs of this Complaint as if fully set forth herein and further allege as follows.

259.    To prove negligent misrepresentation, Plaintiff must prove the following elements: (a) Defendant's negligent supply of false information to a foreseeable person, known or unknown; (b) such person's reasonable reliance upon that false information; and (c) economic injury proximately resulting from such reliance.

260.    At all times material hereto, Defendant misrepresented that the metal-on-metal Conserve®–Dynasty®–Profemur® Hip System in question was safe for its intended use.

261.    Defendant knew or should have known of the use for which the metal-on-metal Conserve®–Dynasty®–Profemur® Hip System was intended and the serious risks and dangers associated with such use of the metal-on-metal Conserve®–Dynasty®–Profemur® Hip System.

262.    Defendant owed a duty to treating physicians and to the ultimate end-users of the metal-on-metal Conserve®–Dynasty®–Profemur® Hip System, including Plaintiff Lawrence E. Meyers, to accurately, truthfully and sufficiently represent the risks of the metal-on-metal Conserve®–Dynasty®–Profemur® Hip System.

263.    Defendant breached its foregoing duty by misrepresenting and/or failing to adequately warn Plaintiff Lawrence E. Meyers' surgeon, the medical community, Plaintiff Lawrence E. Meyers, and the public about the risks of the metal-on-metal Conserve®–Dynasty®–Profemur® Hip System, which Defendant knew or in the exercise of reasonable diligence should have known.  These risks include, but are not limited to, the failure rates, neck fracture rates, the history of failures by fracture of the modular necks, the emission of metal debris, and the likelihood of painful and debilitating revision surgery.

264.     Furthermore, prior to implantation, Plaintiff Lawrence E. Meyers received representations from his surgeon with respect to the devices at issue in this litigation. Specifically, Lawrence E. Meyers was advised by Dr. Theodore P. Firestone, orthopedic surgeon, that the devices at issue were (1) appropriate for him; (2) would permit him to return to an active lifestyle; and (3) would likely last approximately 20 to 25 years following implantation, if not longer.

265.     Upon information and belief, the representations received by Plaintiff Lawrence E. Meyers from Dr. Firestone, as described in the above paragraph, were based on representations that Dr. Firestone received from Defendant, as discussed in detail throughout this Complaint.

266.     Plaintiff Lawrence E. Meyers reasonably relied on the representations identified above, and discussed in detail herein, in proceeding with implantation of the devices at issue in 2007 and 2008.

267.     Upon information and belief, Dr. Firestone relied on Defendant's representations discussed herein, including that the devices at issue would permit a patient to return to an active lifestyle, in deciding to implant Plaintiff Lawrence E. Meyers with the devices at issue.

268.     The representations made by Defendant to Plaintiff, through Plaintiff's surgeon, were inaccurate, insufficient, misleading, and false.

269.     As a direct and proximate result of Defendant's wrongful conduct, Plaintiff Lawrence E. Meyers sustained and will continue to sustain severe physical injuries, severe emotional distress, mental anguish, economic losses, and other damages. Plaintiff Lawrence E. Meyers has expended and may expend money in the future for medical bills and expenses.

270.     As a direct and proximate result of Defendant's wrongful conduct, Plaintiff Dawn Burstyn Meyers sustained and will continue to sustain the loss of consortium of her husband, Lawrence E. Meyers.

271.    Plaintiffs are entitled to recover compensatory damages for the negligent misrepresentations made by Defendant in an amount to be proven at trial, together with costs of this action.

## DAMAGES

272.    Plaintiffs hereby incorporate by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and for their damages for each cause of action further allege as follows.

273.    As a direct and proximate result of the failure of the Wright Medical metal-on-metal Conserve®–Dynasty®–Profemur® Hip System implanted in Plaintiff Lawrence E. Meyers, and the conduct, actions, inactions and omissions of Defendant, Plaintiff Lawrence E. Meyers has sustained injuries and damages including, but not limited to:

a.    serious and permanent physical injuries to bone, muscle, tendons, tissues and nerves in his righ hip, and pelvis;

b.    undergoing revision surgery to remove and replace the hip components and repair the damage that the metal-on-metal Conserve®–Dynasty®–Profemur® Hip System failure caused;

c.    past and future pain, suffering, and anguish, both in mind and in body;

d.    physical disability, past and future;

e.    physical impairment, including permanent impairment;

f.    disfigurement;

g.    loss of enjoyment of life;

h.    medical bills and treatment associated with the replacement surgery, therapy, and recovery therefrom;

i.    future medical bills and expenses; and,

j.    attorney fees and the costs and expenses of litigation as may be permitted by statute.

274.    As a direct and proximate result of Defendant's wrongful conduct, Plaintiff Dawn Burstyn-Meyers sustained and will continue to sustain the loss of consortium of her husband, Lawrence E. Meyers.

**Punitive Damages**

275.    Plaintiffs hereby incorporate by reference all foregoing paragraphs of this Complaint as if fully set forth herein and further allege as follows.

276.    The acts of Defendant were attended by circumstances that they acted with an evil mind, to wit: of malice, or willful and wanton conduct, and/or in reckless disregard of the consequences from which malice may be inferred and showed a total disregard for human life and human suffering or they consciously pursued a course of conduct knowing that it created a substantial risk of significant harm to others.

277.    The willful and wanton conduct of Defendant was conduct purposefully committed which Defendant must have realized as dangerous, done heedlessly and recklessly, without regard to consequences, or of the rights and safety of others, particularly Plaintiff Lawrence E. Meyers.

278.    Defendant, when it had the opportunity to do so, repeatedly failed to correct a known dangerous condition regarding the metal-on-metal Conserve®–Dynasty®–Profemur® Hip System.

279.    Defendant acted willfully, wantonly, and/or recklessly, and in conscious disregard of Plaintiff's rights, and in reckless disregard of patient safety.  Plaintiffs are therefore entitled to an award of punitive and exemplary damages.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs Lawrence E. Meyers and Dawn Burstyn-Meyers pray for judgment in their favor and an award of damages against Defendant Wright Medical technology, Inc., as follows:

(a)     special damages, to include past and future medical and incidental expenses, according to proof;

(b)     past and future general damages, to include pain and suffering, inconvenience, emotional distress, and mental anguish, according to proof;

(c)     damages for past and future physical impairment;

(d)     damages for permanent impairment;

(e)     loss of consortium of Dawn Burstyn-Meyers;

(f)     exemplary and punitive damages in an amount to be determined at trial;

(g)     pre-judgment (as to special damages actually incurred) and post-judgment interest;

(h)     the costs of this action;

(i)     reasonable attorney fees as may be allowed by law; and,

(i)     for any and all such other and further legal and equitable relief as the Court deems necessary, just, equitable and proper.

## <u>JURY TRIAL DEMANDED</u>

**PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.**

Respectfully submitted this 14th day of July, 2021.

s/ *Steve H. Patience*
Steve H. Patience, SBN 009537
Skousen, Gulbrandsen & Patience, PLC
414 East Southern Avenue
Mesa, AZ 85204-4922
Telephone: 480-833-8800
shp@sgplaw.com

George E. McLaughlin (*PHV* forthcoming)
McLaughlin Law Firm, P.C.
1890 Gaylord Street
Denver, CO 80206-1211
Telephone: 720-420-9800
gem@mcllf.com